# UNITED STATES DISTRICT COURT
for the
Central District of California

| | |
|---|---|
| United States of America<br>v.<br>IGNACIO RANGEL-BARAJAS<br><br>*Defendant(s)* | )<br>)<br>)  Case No.  5:25-mj-00134<br>)<br>)<br>)<br>) |

FILED
CLERK, U.S. DISTRICT COURT
03/16/2025
CENTRAL DISTRICT OF CALIFORNIA
BY: _____AP_____ DEPUTY

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of __March 14, 2025__ in the county of __Riverside__ in the __Central__ District of __California__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(a)(1)(A) | See attached affidavit |

This criminal complaint is based on these facts:

Please see attached affidavit

☑ Continued on the attached sheet.

/S/
Complainant's signature

CBP Agent, Alison Delgardo
Printed name and title

Sworn to before me and signed in my presence.

Date: 03/16/2025 at 10:35 a.m.

Judge's signature

City and state: Riverside, California     Honorable Sheri Pym, U.S. Magistrate Judge
Printed name and title

*AUSA:* Courtney Williams (x1473)

**AFFIDAVIT**

I, Border Patrol Agent, Alison Delgardo, being duly sworn, declare and state as follows:

### I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint against Ignacio Rangel-Barajas ("RANGEL-BARAJAS") charging him with violating 18 U.S.C. § 922(a)(1)(A): Dealing, Importing or Manufacturing Without License.

2. This affidavit is also made in support of an application for a warrant to search a digital device (the "SUBJECT DEVICE") found in RANGEL-BARAJAS's car and is currently in the custody of United States Border Patrol, in Indio, California, as described more fully in Attachment A: a Samsung, A10s Smart Phone, Black, SN: R9WMB0PBY0J.

3. The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. § 922(a)(1)(A): Dealing, Importing or Manufacturing Without License and 18 U.S.C. § 922(a)(3): Transporting or Receiving in State of Residence (the "Subject Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

4. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrant, and does not purport to set forth

all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5.  I am a United States Supervisory Border Patrol Agent with the Department of Homeland Security, Customs and Border Protection, United States Border Patrol ("USBP"). I have been employed as a full-time, sworn federal agent with the USBP since April 11, 2016. I graduated from the USBP Basic Border Patrol Training Academy located in Artesia, New Mexico and I am a Federal Law Enforcement Officer within the meaning of Rule 41(a)(2)(C) of the Federal Rules of Criminal Procedure. I am authorized by Rule 41(a) of the Federal Rules of Criminal Procedure to make applications for search and seizure warrants and serve arrest warrants. I have experience in and have received training with respect to conducting investigations of violations of Titles 8, 18, 19, and 21 of the United States Code. More specifically, in my experience in law enforcement, I have participated in numerous investigations involving immigration offenses, drug offenses, and firearm offenses.

## III. STATEMENT OF PROBABLE CAUSE

6.  Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

2

**A.     Border Patrol Agents Initiate Traffic Stop on RANGEL-BARAJAS's Car**

7.     On or about March 14, 2025, Border Patrol Agents from the Indio Station assigned to the Disrupt Team were working the Interstate 10 corridor near Desert Center, California.  The Disrupt Team predominantly works interstates and thoroughfares throughout the Indio Station's area of responsibility targeting Transnational Criminal Organizations involved in alien and narcotics smuggling.  The Interstate 10 corridor is a known smuggling route from Phoenix, Arizona to Los Angeles, California.  Border Patrol Agents Justin Kim, Robert Raymer, Raymond Herrera, Alfred Perez and Gregory Oliver were involved in this investigation.

8.     At approximately 2:00 p.m., Agents Perez and Herrera were positioned on the median observing traffic traveling westbound on Interstate 10, approximately five miles east of Corn Springs Road.  Agents Perez and Herrera were in an unmarked Border Patrol service vehicle, equipped with operating lights and sirens.

9.     While positioned on the I-10, Agents Perez and Herrera saw a 2024 Subaru WRX with California license plates ("the Subaru"), pass their location traveling in the number one lane. The driver, later identified as RANGEL-BARAJAS, appeared to be traveling alone.  Initially RANGEL-BARAJAS was traveling with the flow of traffic, however, once he saw the agents' service vehicle, he immediately hit his brakes, conducted an unnecessary lane change forcing himself in between two cars as he moved into

the slow lane.  Based on my prior training and experience, erratic driving behavior is common in smuggling cases; vehicles involved in criminal activity will make abrupt and unnecessary lane changes.

    10.  The Agents merged onto I-10 behind RANGEL-BARAJAS to investigate.  RANGEL-BARAJAS then paced the Subaru behind semi-trucks to conceal himself.  RANGEL-BARAJAS continued to conceal himself between semi-trucks for several miles.  In my training and experience, vehicles involved in smuggling activity will use this driving tactic to allow law enforcement vehicles to pass their vehicles undetected.

    11.  RANGEL-BARAJAS then began to swerve back and forth in his lane crossing over the fog line and the center line dividing the two-lane highway.  Based on my prior training and experience, when drivers are preoccupied looking in their mirrors searching for law enforcement vehicles, they tend to not pay attention to the road and tend to swerve.

    12.  According to the agents, RANGEL-BARAJAS's driving behavior seemed strange and may have been due to his heightened fear of law enforcement presence while knowing he was currently involved in criminal activity.

    13.   Agent Herrera conducted a vehicle check through El Centro Sector radio communications and received information that the Subaru was registered to "Ignacio Rangel Barajas" out of El Cajon, California.  Dispatch also told Agents Perez and Herrera that RANGEL-BARAJAS had an inbound Port-of-Entry crossing

earlier on March 14, 2025, at 4:00 a.m. through San Ysidro, California from Mexico.

14. Agent Herrera also asked Agent Garcia to conduct a records check on the Subaru. Agent Garcia also found the Subaru's 4:00 a.m. inbound crossing and told Agent Herrera that person who had crossed the border in the car that morning was the registered owner, RANGEL-BARAJAS. He also sent the agents a photograph of RANGEL-BARAJAS crossing the San Ysidro Port of Entry that morning.

15. Agent Garcia also found RANGEL-BARAJAS's arrest records and told Agents Herrera and Perez that RANGEL-BARAJAS had a prior March 2020 arrest for alien smuggling, a prior January 2025 arrest for attempting to smuggle twelve firearms at the San Ysidro Port of Entry, and he had Department of Homeland Security alerts for possible transportation of firearms.

16. Agents Perez and Herrera pulled up alongside the driver side of the Subaru and positively identified the driver, RANGEL-BARAJAS, as the driver who crossed the San Ysidro, California Point of Entry. There were no other occupants visible in the Subaru travelling with RANGEL-BARAJAS.

17. As Agents Perez and Herrera continued to follow RANGEL-BARAJAS, they saw him sitting in an upright, rigid and stiff position. Agent Herrera saw RANGEL-BARAJAS looking forward; he never looked over at the Border Patrol vehicle. Based on my training and experience, subjects involved in criminal activity will avoid looking at law enforcement vehicles while driving.

5

18.  Agents Perez and Herrera also saw RANGEL-BARAJAS continuously look back at the agents through his side and rear-view mirrors and they saw RANGEL-BARAJAS once again swerve over the fog line and back crossing over the center line dividing the two-lane highway.

19.  Agents Perez and Herrera followed RANGEL-BARAJAS westbound on Interstate 10 for approximately 60 miles.  Based on RANGEL-BARAJAS's border crossing, RANGEL-BARAJAS's travel pattern from Mexico, RANGEL-BARAJAS's driving behavior, RANGEL-BARAJAS's behavior, RANGEL-BARAJAS prior arrest for firearm smuggling, Agents Perez and Herrera stopped RANGEL-BARAJAS's car on I-10 near the Golf Center Parkway exit in Indio.  Agent Garcia arrived on scene and assisted with the stop.

20.  Agent Perez approached the Subaru from the passenger side and identified himself as a Border Patrol Agent.  RANGEL-BARAJAS immediately requested to be spoken to in Spanish and said he spoke very little English.  Agent Perez requested RANGEL-BARAJAS's identification or a driver's license in Spanish and RANGEL-BARAJAS provided a California driver's license.

21.  Agent Perez asked RANGEL-BARAJAS if he was the owner of the vehicle and RANGEL-BARAJAS said yes, and Agent Perez asked RANGEL-BARAJAS if he currently lived in El Cajon and RANGEL-BARAJAS said he lived in Spring Valley.  Agent Perez saw a pocketknife in RANGEL-BARAJAS's right front pocket and asked him to leave it in the vehicle.  Agent Perez asked RANGEL-BARAJAS if he had any other weapons on him and RANGEL-BARAJAS

6

stated "no." RANGEL-BARAJAS exited the Subaru and walked to the rear of the car where Agent Herrera was standing.

22. Agents Perez and Herrera began questioning RANGEL-BARAJAS. Agent Perez asked RANGEL-BARAJAS questions like where he was traveling from and where he worked. RANGEL-BARAJAS said that he does waterproofing in downtown Arizona. When asked about his schedule, RANGEL-BARAJAS struggled to answer and fumbled his words.

23. Agent Perez asked RANGEL-BARAJAS if he had ever been arrested, and RANGEL-BARAJAS said he was arrested for firearms at the Port of Entry but had never been to jail. RANGEL-BARAJAS mentioned that he was let go and nothing happened. RANGEL-BARJAS said he had an interview with a federal agent named "Garcia."[1] Agent Herrera asked RANGEL-BARAJAS how he got involved with firearms and he said he was recruited.

24. Agent Perez asked RANGEL-BARAJAS if there was anything illegal in the vehicle, and RANGEL-BARAJAS said yes and that he had firearms in the vehicle.

25. Agent Herrera told RANGEL-BARAJAS he was under arrest for being in possession of firearms. He placed RANGEL-BARAJAS in handcuffs and placed him inside the patrol vehicle and <u>Mirandized</u> him at approximately 3:37 p.m. Agent Herrera asked RANGEL-BARAJAS where the firearms were located, and RANGEL-BARAJAS replied they were inside the trunk.

---

[1] Agents have tried to locate the federal agent Garcia that RANGEL-BARAJAS is referring to but have not been able to find the agent and are not sure this person exists.

26. Agents Herrera, Garcia, and Lamadrid searched RANGEL-BARAJAS's car for the illegal firearms. The Agents found two duffle bags concealed in the spare tire compartment. The Agents recovered four rifles, eight handguns, sixteen magazines and a total of 50 pistol rounds (9mm and .380 caliber) from the duffle bags.

27. RANGEL-BARAJAS said he does go to Mexico, but said he does not travel into Mexico with the firearms, and he leaves them in San Diego.

**B.   RANGEL-BARAJAS Admitted to Trafficking Firearms**

28. Based on my review of law enforcement reports and recordings, I am aware that on March 14, 2025, at approximately 7:00 p.m. at the Indio Border Patrol Station in Indio, California, RANGEL-BARAJAS was re-advised of his Miranda rights in Spanish. RANGEL-BARAJAS again stated that he understood his rights and again agreed to answer questions without the presence of an attorney. RANGEL-BARAJAS also signed a Miranda form.

29. In the audio-video recorded and Mirandized interview, RANGEL-BARAJAS stated, in substance, the following:

    a.   RANGEL-BARAJAS said that he is a United States citizen having been born in Newport Beach, California. RANGEL-BARAJAS said his mailing address was at an address in El Cajon, California. RANGEL-BARAJAS claimed he resides full time at Calle Cucapa, Domicilio Conocido in Tijuana, Baja California, Mexico.

  b. RANGEL-BARAJAS admitted he was trafficking firearms from Phoenix, Arizona to Chula Vista, California to supply the Sinaloa Cartel in Tijuana, Baja California, Mexico.

  c. RANGEL-BARAJAS stated he was going to profit approximately $1,000 dollars in U.S currency if he successfully delivered the firearms to San Diego.

  d. RANGEL-BARAJAS admitted to ten prior successful illegal firearms trafficking events from San Diego to Tijuana and to have profited over $10,000 dollars in U.S currency in payment.

  e. RANGEL-BARAJAS stated that on the date of his arrest, he traveled from Tijuana, Mexico to Phoenix, Arizona to pick up approximately ten firearms for unknown individuals operating under the Sinaloa Cartel.

  f. RANGEL-BARAJAS stated on March 14, 2025, he arrived in Phoenix at approximately 11:00 a.m., where he met up with an unknown individual driving a brown Infinity at a public, predetermined location.

  g. RANGEL-BARAJAS declined to provide further details on the individual claiming concerns for his safety and family members safety.

  h. After receiving the firearms, RANGEL-BARAJAS said he proceeded to San Diego via Interstate 10, while sharing his live location with the facilitators via WhatsApp messaging application.

  i. RANGEL-BARAJAS stated he was recently arrested for firearms trafficking near the San Ysidro Port of Entry and

during that event RANGEL-BARAJAS stated that he was interviewed by federal agents and subsequently released.

### C. The Firearms Likely Traveled in and Affected Interstate Commerce

30. From my discussions with law enforcement personnel and review of reports, I know that on March 14, 2025, Bureau of Alcohol, Tobacco, Firearms and Explosives Special Agent Paul Kirwan -- who is trained in analyzing firearms -- examined photographs of the twelve firearms recovered from RANGEL-BARAJAS's vehicle. Agent Kirwan determined that the firearms were manufactured outside California. Because the firearms were recovered in California, I believe it has traveled in and affected interstate commerce.

31. ATF personnel queried the Federal Licensing System and RANGEL-BARAJAS has never been licensed to deal in firearms.

### IV. TRAINING AND EXPERIENCE ON FIREARMS OFFENSES

32. From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct who conduct firearms investigations, I am aware of the following:

    a. Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such in their digital devices. It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual

who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals. Such information is also kept on digital devices.

      b. Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices. These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

      c. Those who illegally possess firearms often sell their firearms and purchase firearms. Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices. This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price. In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale. In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

### V. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

33. As used herein, the term "digital device" includes the SUBJECT DEVICE.

34. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

    a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

    b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat

programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

      c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

      d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

35. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for several reasons, including the following:

      a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

      b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

    36.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

///

///

///

## VI. CONCLUSION

37. For the reasons described above, there is probable cause to believe that RANGEL-BARAJAS has committed violations of 18 U.S.C. § 922(a)(1)(A): Dealing, Importing or Manufacturing Without License. There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICE described in Attachment A.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this __16th__ day of
March 2025.

_____
HONORABLE SHERI PYM
UNITED STATES MAGISTRATE JUDGE

15